Filed 10/13/15  P. v. Espinoza CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>PEDRO ESPINOZA,<br><br>    Defendant and Appellant. | H039787<br>(Santa Clara County<br>Super. Ct. Nos. CC634285,<br>C1116416)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on September 15, 2015, be modified in the following particulars:

1.  On page 15, line 1 of the first full paragraph, the phrase "other than the fact that she provided more detail about the incident at trial than during her initial reports" is inserted after the phrase "was not a weaker case," so that the sentence reads as follows: The case involving R. Doe was not a weaker case other than the fact that she provided more detail about the incident at trial than during her initial reports.

2.  On page 19, line 4, change the phrase "unwilling to discuss the case," to "unwilling to 'elaborate' on 'the details' of 'what was in her report,' " so the sentence reads as follows:  **A defense investigator had spoken to Erwin, who was unwilling to** "elaborate" on "the details" of "what was in her report."

3. On page 20, line 5, the phrase "a personal opinion about the witness" is changed to "a personal opinion about the witness's reputation," so that the sentence reads as follows:  However, as the Attorney General points out, a person who renders reputation testimony must have a personal opinion about the witness's reputation.

4. On page 21, line 15 of the first paragraph, the following is added to the parenthetical case citation:  "see also *People v. Superior Court* (2003) 107 Cal.App.4th 488, 491 [juvenile court has 'the exclusive authority to determine when juvenile records will be released' because the Legislature has determined 'that the juvenile court has both the " 'sensitivity and expertise' to make decisions about access to juvenile records" ']; *T.N.G. v. Superior Court* (1971) 4 Cal.3d 767, 778; cf. *J.E. v. Superior Court* (2014) 223 Cal.App.4th 1329, 1338 [a Welf. & Inst. Code, § 827 petition 'has long been recognized as an appropriate vehicle to protect both the defendant's right to a fair trial and the state's interest in confidentiality of the files']" so the parenthetical citation reads as follows: (*Cimarusti, supra,* at p. 805; see also *People v. Superior Court* (2003) 107 Cal.App.4th 488, 491 [juvenile court has "the exclusive authority to determine when juvenile records will be released" because the Legislature has determined "that the juvenile court has both the ' "sensitivity and expertise" to make decisions about access to juvenile records' "]; *T.N.G. v. Superior Court* (1971) 4 Cal.3d 767, 778; cf. *J.E. v. Superior Court* (2014) 223 Cal.App.4th 1329, 1338 [a Welfare section 827 petition "has long been recognized as an appropriate vehicle to protect both the defendant's right to a fair trial and the state's interest in confidentiality of the files"].)

5. On page 41, line 7, the phrase "her own opinion about A. Doe's character for truthfulness" is changed to "her own opinion about A. Doe's character or reputation for truthfulness," so that the sentence reads as follows:  As we have explained, it was not clear that the "chronic liar" opinion came from Erwin or that Erwin had her own opinion about A. Doe's character or reputation for truthfulness.

There is no change in the judgment.

The petition for rehearing is denied.

_____
BAMATTRE-MANOUKIAN, ACTING P.J.


_____
MIHARA, J.


_____
MÁRQUEZ, J.

Filed 9/15/15  P. v. Espinoza CA6 (unmodified version)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>PEDRO ESPINOZA,<br><br>    Defendant and Appellant. | H039787<br>(Santa Clara County<br>Super. Ct. Nos. CC634285,<br>C1116416) |

## I.    INTRODUCTION

Defendant Pedro Espinoza appeals after a jury found him guilty of forcible sodomy in concert (count 1; former Pen. Code, § 286, subd. (d)),[1] forcible oral copulation in concert (count 2; former § 288a, subd. (d)), aggravated sexual assault of a child under the age of 14 and more than 10 years younger than defendant (count 3; former § 269), and forcible lewd acts on a child under the age of 14 (count 4; former § 288, subd. (b)(1)).  Counts 1 and 2 pertained to victim A. Doe; counts 3 and 4 pertained to victim R. Doe.[2]  As to counts 1 and 2, the jury found true allegations that defendant

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Both victims have been identified by the last name Doe for confidentiality purposes, but the victims are not related.

kidnapped A. Doe.  (Former § 667.61, subds. (b) & (e)(1).)  The trial court sentenced defendant to an indeterminate term of 30 years to life, consecutive to an eight-year determinate term.

On appeal, defendant contends the trial court erred by:  (1) denying defendant's motion to sever the counts related to A. Doe and R. Doe; (2) excluding evidence that A. Doe had a reputation for being a "chronic liar" and denying a discovery request related to that evidence; (3) excluding evidence that A. Doe had committed prostitution on a number of occasions subsequent to the charged offenses; (4) excluding evidence that, prior to the charged offenses, A. Doe claimed that her stepfather had sexually assaulted her; (5) instructing the jury that sodomy in concert and oral copulation in concert could be committed by duress or menace; and (6) excluding evidence that R. Doe had made a prior claim of being molested and had learned about molestation from a cousin.

Defendant also contends his trial counsel was ineffective for failing to: (1) conduct adequate pretrial investigation; (2) request a limiting instruction concerning propensity evidence; (3) raise certain objections under the federal Constitution; and (4) object to prosecutorial misconduct.

Defendant further claims that the cumulative effect of all the errors requires reversal, that the trial court erred by imposing a $10,000 restitution fund fine without considering defendant's ability to pay, and that the abstract of judgment incorrectly reflects a $70 AIDS fine.  The Attorney General concedes that the $70 AIDS fine should not have been included in the abstract of judgment.

We will affirm the judgment and order the $70 AIDS fine deleted from the abstract of judgment.

Appellate counsel has filed a petition for writ of habeas corpus, which this court ordered considered with the appeal.  We have disposed of the habeas petition by separate order filed this day.  (See Cal. Rules of Court, rule 8.387(b)(2)(B).)

2

## II. BACKGROUND

### A. Offenses Involving A. Doe

A. Doe was born male and given a male name at birth. As a teenager, A. Doe began using a female name and presenting herself as female, although she was still biologically male.[3] At trial, A. Doe was 33 years old.

On April 13, 1996, when A. Doe was 16 years old, she was living with her aunt. She went out to downtown San Jose in the evening, taking a bus and walking. She was wearing a t-shirt, shorts, sandals with heels, and makeup. She danced until about 1:30 a.m. or 2:00 a.m., then took a bus and walked home.

As A. Doe was walking home, a vehicle approached. The car was "some kind of older car, Oldsmobile, maybe." It contained two Hispanic young adult males, one of which was defendant, who was driving. The men asked if A. Doe wanted a ride. A. Doe said no, but the vehicle stopped and the passenger got out. The passenger blocked her path, told her to get in the car, and pushed or pulled her into the backseat.

Inside the car, while defendant drove, the passenger tried to kiss A. Doe and tried to put his hand under her shirt, but A. Doe pushed him off of her. The passenger also touched her legs, pulled her neck and head towards him, and sucked and bit her neck and face. The car eventually stopped in a residential area. The passenger continued to touch and pull A. Doe. They men spoke to each other and cursed at A. Doe. They said things like, "Bitch, you like it. Bitch, suck my dick." The passenger put his penis into A. Doe's mouth and "forced" her to orally copulate him.

Defendant got into the back of the car. He and the passenger removed A. Doe's clothing. When they saw that she had a penis, they called her a "faggot" in Spanish. One of the men choked her. Defendant took out his penis and put it into her anus, which hurt

---

[3] A. Doe testified that she later legally changed her name to a female name. Thus, we will use female pronouns for A. Doe.

because it was forced. Defendant ejaculated into her anus. The passenger ejaculated into her mouth. After ejaculating they both returned to the front seat of the car. A. Doe used a baby sock, which was in the car, to wipe semen from her mouth.

The men went through A. Doe's purse and took her identification and her money. They told her that if she said anything, they would "come after" her. They drove her back to the area where they had picked her up. One of the men got out of the car and went to the trunk.[4] She thought both men looked like "gangsters," specifically, like Sureños.

A. Doe got out of the car and, after the men had left, went to a nearby home, where she banged on the door. When someone came to the door, she asked for help, and the person called the police. The police responded and took A. Doe to Valley Medical Center.

At Valley Medical Center, a sexual assault response team (SART) exam was conducted. A. Doe told the examiner that two Mexican males had assaulted her in the backseat of a car. One had put his penis into her rectum. She had orally copulated both men. Both men had masturbated her. Spit had been used as lubricant. There had also been kissing, fondling, and licking, as well as physical blows, grabbing, holding, choking, and biting. The men had threatened to kill her if she did not cooperate.

A. Doe complained that her neck hurt and that her anus was burning. She had contusions on her neck in a linear/circular formation, which were consistent with hand or finger marks left by a choking or strangling. Marks on A. Doe's neck were consistent with sucking. Her anus had abrasions and bruises. Her injuries were consistent with nonconsensual sexual intercourse and her description of the incident. Her injuries could also be consistent with a consensual act if her "normal method of having sex" involved

---

[4] A. Doe testified she thought defendant was getting a gun from the trunk, but the trial court struck that testimony.

4

being grabbed around the neck and anal penetration. A. Doe's clothing was "clean and intact."

A. Doe was interviewed by an investigator from the District Attorney's office about two weeks after the incident. She described the perpetrators' car as "a 4-door larger sedan," possibly a Buick. She described the car as dark blue, maroon, or brown, with bench seats, a blue velour interior, and slide locks.

A. Doe told the investigator she had gone to a club in downtown San Jose by bus, and that she had taken a bus part of the way home and then walked. When the perpetrators approached her, the passenger had ordered her to get into the car, and he had herded her towards the car. The driver had grabbed her arm and pulled her in while the passenger pushed her in. The passenger had put his leg on top of hers, kissed and bit her neck, held her by the neck and hair, fondled her breasts, and put her hands on his crotch, then forced her to rub his erect penis. The car had driven into a residential area, where the driver had gotten into the back seat. The driver had kissed and bit her neck, strangled her, and put his hands on her breasts under her shirt. Both men had pulled her hair and hit her. The passenger had pushed her head into the driver's crotch and forced her to orally copulate the driver. The driver did not ejaculate into her mouth. The passenger had pulled her off the driver and repositioned her to orally copulate himself. The driver had then penetrated her anus while she continued to orally copulate the passenger. The driver had ejaculated into her anus and then gotten back into the front seat. He had driven while A. Doe continued to orally copulate the passenger, who had ejaculated into her mouth. After the car stopped, the passenger had pushed her out of the vehicle and thrown a sock at her, which she had used to spit out semen and wipe her mouth. The men had taken money from her purse.

DNA swabs were taken from A. Doe's anus, neck, mouth, and finger. The swabs were not analyzed right away, because in 1996, the crime lab did not have the technology to provide DNA evidence without a suspect for comparison. In 2003, the DNA swabs

were analyzed. Sperm cells were found on the anus swabs, and sperm cell fractions were found on the teeth swabs. The sperm cell fractions from the teeth swabs came from two or more unidentified males. The DNA from the anus swabs came from one male.

On July 22, 2011, a DNA sample was collected from defendant. Defendant's DNA matched the DNA found in the swab from A. Doe's anus. Defendant's DNA did not match the DNA found in the swab from A. Doe's teeth.

### B. Evidence Admitted Concerning A. Doe's Credibility

The jury heard evidence that in 2007, A. Doe got into a man's car at a bus stop after he offered her a ride. The man grabbed her hand and pulled her into the car. When he did not take her where she wanted to go, A. Doe tried to get out of the car. The man grabbed her cell phone, and she took his cell phone. A. Doe was able to get out after the man stopped the car. Police officers came, and A. Doe told them she had been kidnapped. However, this was not really true because she could have pulled away from the man and not gotten into the car. She later told the police that she was not kidnapped, because she could have gotten away, but that she was held against her will.

The jury also heard that A. Doe suffered a number of criminal convictions after the 1996 incident and before the 2013 trial. In 1999, she was convicted of a misdemeanor involving moral turpitude and providing false information to a peace officer. In 2000, she was convicted of a misdemeanor involving moral turpitude. In 2005, she was convicted of felony vehicle theft and three counts of battery on a peace officer. In 2007, she was convicted of two misdemeanors involving moral turpitude. In 2009, she was convicted of felony grand theft from a person.

### C. Defense Evidence—A. Doe

San Jose Police Officer Jason Tanner had investigated the 2007 incident in which A. Doe alleged she had been kidnapped. When he interviewed A. Doe, she said she did not want to press charges. She said, "It wasn't like a kidnapping, more like he held me against my will." She said she had gotten into the car voluntarily. Although the driver

6

had grabbed her arms, she "probably could have pulled away." The driver refused to let her out when she asked.

S. L., defendant's former wife, testified that around 1996, defendant had a white four-door Chevrolet, which was an older, box-type vehicle with bench seats, a dark interior made of velour-like material, and stem locks.

### D.      Offenses Involving R. Doe

At age 15, S. L. gave birth to R. Doe. S. had met defendant when she was 17 years old, through one of his sisters and his mother. S. and defendant married when S. was 18 years old and R. Doe was about two and half. S. had four children with defendant.

S., defendant, and the children sometimes stayed with defendant's mother, and sometimes they stayed at a family shelter. In April of 2000, when R. Doe was about six years old, she spent some time staying with defendant's mother. Defendant would sometimes stay with his mother and sometimes stay at the shelter. When defendant and R. Doe stayed with his mother, they shared a bedroom, which contained two beds.

Some time in April of 2000, S. was talking to defendant's sisters about her relationship with defendant and expressing uncertainty about whether she should stay with him. During the conversation, R. Doe said, "[M]ommy, I don't want you to be with him." S. asked why. R. Doe replied, "I don't like him," then told S. she wanted to tell her something. They found a private spot to talk. R. Doe then said that defendant had kissed her "with his tongue." S. asked R. Doe if she was sure and whether defendant had touched her. R. Doe said, "[Y]es," to both questions. S. asked where defendant had touched her. R. Doe said that defendant "put his fingers in my butt." R. Doe said that defendant had asked her not to say anything and that he had given her a dollar so that she would not say anything. According to S., R. Doe was not the type of child who made up stories.

7

On April 15, 2000, R. Doe disclosed the molestation to Chata Alfaro, then the interim director of the family shelter where the family was staying. R. Doe came in to Alfaro's office one day after school and told her that defendant had touched her. R. Doe pointed to her vagina area. She said that defendant had also kissed her on the lips and touched her "butt." R. Doe said that defendant "wasn't supposed to touch little girls like that, and I'm a little girl." Alfaro asked R. Doe if she was okay, and R. Doe repeated her complaint. R. Doe was upset and indignant. Alfaro then flagged down a police officer, who interviewed R. Doe.

R. Doe was 19 years old when she testified at trial. She recalled staying with defendant's mother when she was about six years old and not understanding why. She recalled that defendant did not treat her as well as he treated his own daughters. He would be rude to her and he physically disciplined her.

R. Doe recalled the molestation that occurred in April of 2000. She had seen defendant drinking that night. She had gone to bed, and when defendant came into the bedroom, she pretended to be asleep. Defendant closed and locked the bedroom door. Initially, defendant went to his separate bed, but then he came over to R. Doe's bed, where he sat down. Defendant stroked R. Doe's leg and then moved his hand over her pelvic area. He then touched her chest under her shirt. R. Doe was too scared to say anything. Next, defendant touched her vagina under her shorts, and he put a finger into her vagina, which hurt. Defendant asked R. Doe if it hurt, and she replied, "Yeah," and told him, "I'm just a little girl."

Defendant's mother then came to the door and asked if everything was okay. Defendant responded, "Everything is okay," while holding his hand over R. Doe's mouth. Defendant then went back to his bed, but after a few minutes, he instructed R. Doe to "come here." R. Doe pretended to be asleep and did not respond, but after defendant repeated his command two more times, R. Doe complied.

8

Defendant reached for R. Doe's hand and told her, "[S]it on me." He sat her on top of him and spread her legs. Defendant then told R. Doe to kiss him. Doe did not comply until after defendant repeated his command and pulled her towards him. Doe then quickly kissed defendant on the lips. Defendant became angry and told her to kiss him more. He pulled at her and put his tongue into her mouth.

Defendant told R. Doe she could get off, so she climbed off the bed. Defendant then reached for her hand, spread her fingers, and placed her hand on his erect penis, over his clothing. R. Doe resisted when defendant tried to make her stroke his penis, by clenching her fingers into a fist, but defendant pulled her fingers apart.

After defendant let her go, R. Doe returned to her bed. She felt pain in her vagina, and during the night, she woke up and smelled like pee. Defendant told her, "Don't tell anyone," and the next day, he gave her a dollar, which was unusual. At school the day after the molestation, R. Doe peed on herself. Her vagina hurt when she peed, and she did not want to sit cross-legged.

### E.    Defense Evidence – R. Doe

Defendant's two sisters testified. According to one sister, the bedroom where the R. Doe offenses allegedly occurred had no lock on the door. Both sisters testified that defendant did not treat R. Doe differently than his own children or his nieces and nephews. They also testified that R. Doe did not seem afraid of defendant, nor did she try to avoid him, after April of 2000. They both believed defendant was not the kind of person who would touch a young child sexually.

San Jose Police Officer Manuel Martinez was the officer who had been flagged down by Alfaro, the family shelter director, on April 15, 2000. Alfaro conveyed to him that R. Doe said that defendant had kissed her on the lips and touched her butt. Officer Martinez interviewed R. Doe, who said defendant had kissed her on the lips, touched her "butt," put his finger into her mouth, and put her finger into his mouth. R. Doe did not report any pain or that defendant had forced her to touch his penis. R. Doe said that

9

defendant had sat her on top of him, and that he had given her a dollar so that she would not say anything.

### F. Charges, Verdicts, and Sentence

Defendant was charged by first amended consolidated information with forcible sodomy in concert (count 1; former § 286, subd. (d)), forcible oral copulation in concert (count 2; former § 288a, subd. (d)), aggravated sexual assault of a child under the age of 14 and more than 10 years younger than defendant (count 3; former § 269), and forcible lewd acts on a child under the age of 14 (count 4; former § 288, subd. (b)(1)). Counts 1 and 2 pertained to victim A. Doe; counts 3 and 4 pertained to victim R. Doe. As to counts 1 and 2, the information alleged that defendant kidnapped A. Doe. (Former § 667.61, subds. (b) & (e)(1).)

A jury found defendant guilty of all counts and found true the two kidnapping allegations. The trial court sentenced defendant to an indeterminate term of 15 years to life for count 1 (forcible sodomy in concert), a concurrent indeterminate term of 15 years to life for count 2 (forcible oral copulation in concert), a consecutive indeterminate term of 15 years to life for count 3 (aggravated sexual assault of a child), and a consecutive eight-year determinate term for count 4 (forcible lewd acts).

## III.   DISCUSSION

### A. Denial of Motion to Sever

Defendant contends the trial court erred by denying his motion to sever the counts related to A. Doe from those related to R. Doe. He further contends that the denial of his severance motion violated his right to due process under the Fourteenth Amendment.

#### 1. Proceedings Below

Initially, the charges relating to A. Doe and R. Doe were included in separate informations, filed on June 23, 2011 and October 27, 2011, respectively. The trial court

subsequently granted the District Attorney's motion to consolidate the two cases pursuant to section 954.[5]

Defendant later filed a motion to sever. He argued that the two incidents were "distinct" and that the two alleged victims were "dissimilar," with no connection to one another. Defendant argued that the evidence of each incident would not be cross-admissible in separate trials because there were no common witnesses and because the crimes and victims were not similar enough to be admissible for a purpose specified in Evidence Code section 1101, subdivision (b). Defendant further argued that the two sets of crimes were not cross-admissible as propensity evidence under Evidence Code section 1108, because rapists do not have a propensity to commit child molestations and child molesters do not have a propensity to commit rapes. Defendant argued that both cases had significant weaknesses, and that the "spillover effect" would be to inflame the jury and thereby strengthen each case.

Defendant included, as an exhibit to his motion to sever, a declaration from a licensed clinical and forensic psychologist, Brian R. Abbott, Ph.D. Dr. Abbott explained that in general, the motivations for rape and child molestation are different, so it is unusual for an individual to commit both types of offenses. Rape is not driven by the need for sexual gratification; a rapist uses sex to control or dominate the victim. In contrast, the motivation for child molestation is sexual pleasure. Dr. Abbott described a study involving rapists and incest offenders, which revealed that 10 percent of the incest offenders had also committed rapes, and that 16 percent of the rapists had committed incest offenses.

---

[5] Section 954 provides in pertinent part: "An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated."

11

The prosecution filed opposition to defendant's motion to sever. The prosecutor argued that under section 954, there does not need to be a connection between the joined crimes, as long as the crimes are of the "same class," and that in this case, all four crimes were "assaultive" sex offenses. The prosecution further argued that the evidence would be cross-admissible in separate trials, pursuant to Evidence Code section 1101, subdivision (b) and Evidence Code section 1108. The prosecutor argued that both cases were equally inflammatory and that both cases had strengths and weaknesses.

The trial court found that under section 954, consolidation was proper because the two sets of offenses were both assaultive in nature and thus "are the same class" of crimes. The trial court noted that under section 954.1, cross-admissibility was not required, but that the two sets of offenses were cross-admissible as propensity evidence under Evidence Code section 1108. The trial court noted that Evidence Code section 1108 does not distinguish between types of sex offenses and that the defense expert had not excluded the possibility that one person can have a propensity to commit both rapes and incest offenses. Regarding the prejudicial effect of a joint trial, the trial court found that the cases were "close to equal" in terms of their strengths and weaknesses and that any prejudice did not outweigh the probative value of each case as to the other case.

### 2.  Analysis

The California Supreme Court has outlined the statutory criteria for joinder of charges and the standard of review for an order denying a defendant's motion to sever joined charges. "[P]ursuant to section 954 an accusatory pleading may charge two or more different offenses so long as at least one of two conditions is met: The offenses are (1) 'connected together in their commission,' or (2) 'of the same class.' " (*People v. Soper* (2009) 45 Cal.4th 759, 771, fn. omitted (*Soper*).) The Legislature's purpose in enacting section 954 was to avoid " 'the increased expenditure of funds and judicial resources which may result if the charges were to be tried in two or more separate trials.'

12

[Citation.]" (*Soper, supra,* at p. 772.) Accordingly, "consolidation or joinder of charged offenses 'is the course of action preferred by the law.' [Citation.]" (*Ibid.; People v. Hartsch* (2010) 49 Cal.4th 472, 493 (*Hartsch*).)

The threshold question is whether the charges were properly joined. Here, defendant does not challenge the trial court's finding that all of the charges were "of the same class" because they involved assaultive sexual offenses and that therefore they were properly joined. (§ 954; *Soper, supra,* 45 Cal.4th at p. 771.) Thus, we proceed to consider whether the trial court erred by denying defendant's motion to sever.

The standard of review for an order denying a motion to sever properly joined charges is abuse of discretion. "A defendant, to establish error in a trial court's ruling declining to sever properly joined charges, must make a ' "*clear showing of prejudice* to establish that the trial court *abused its discretion.*" ' [Citation.]" (*Soper, supra,* 45 Cal.4th at p. 774.) "Denial of a motion for severance amounts to a prejudicial abuse of discretion if the trial court's ruling falls outside the bounds of reason." (*Hartsch, supra,* 49 Cal.4th at p. 493.) To determine whether the trial court abused its discretion, " 'we consider the record before the trial court when it made its ruling.' [Citation.]" (*Soper, supra,* at p. 774; *Hartsch, supra,* at p. 493.) " ' "The factors to be considered are these: (1) the cross-admissibility of the evidence in separate trials; (2) whether some of the charges are likely to unusually inflame the jury against the defendant; [and] (3) whether a weak case has been joined with a strong case or another weak case so that the total evidence may alter the outcome of some or all of the charges. . . ." ' " (*Hartsch, supra,* at p. 493.) We must also determine whether joinder resulted in " 'gross unfairness' " amounting to a denial of due process. (*People v. Valdez* (2004) 32 Cal.4th 73, 120 (*Valdez*); see also *Hartsch, supra,* at pp. 494-495.)

" 'We frequently have observed that if evidence underlying the offenses in question would be "cross-admissible" in separate trials of other charges, that circumstance normally is sufficient, standing alone, to dispel any prejudice and justify a

13

trial court's refusal to sever the charged offenses.  [Citations.]' " (*Hartsch, supra,* 49 Cal.4th at p. 493.)  "On a motion for severance, the defendant bears the burden of showing that evidence would not have been cross-admissible in a separate trial." (*Id.* at p. 494.)

We first turn to the question of whether the two sets of offenses would have been cross-admissible in separate trials.  As noted above, the trial court found that the two sets of offenses were cross-admissible under Evidence Code section 1108, which allows the prosecution to introduce "evidence of the defendant's commission of another sexual offense or offenses" when the defendant is accused of a sexual offense, "if the evidence is not inadmissible pursuant to [Evidence Code] Section 352." (Evid. Code, § 1108, subd. (a).)

Defendant contends that the trial court's analysis under Evidence Code section 352 was "wholly inadequate" and erroneous.  He suggests the trial court may have erroneously believed it could deny defendant's motion to sever simply because section 1108 generally permits the introduction of uncharged sex crimes, and that the trial court erroneously found that both cases were equally strong.  The record does not support these claims.  The trial court's remarks indicate it understood that the two sets of crimes were not necessarily cross-admissible, but rather that their cross-admissibility depended on the outcome of an analysis under Evidence Code section 352.  The trial court also did not erroneously find that both cases were strong.  The trial court found that the cases were "equal in terms of their strength," but that both cases also had a weakness, because in both cases there was "a complaining witness and really no other witness to the specific acts."

Defendant further argues that both of the cases were "weak," that they were "extremely dissimilar," and that they were both so inflammatory as to "create an extreme level of prejudice."  However, the record supports the trial court's assessment of the two cases as having approximately equal strengths and weaknesses, and its determination that

14

this was not a situation in which " ' "a weak case has been joined with . . . another weak case." ' " (*Hartsch, supra,* 49 Cal.4th at p. 493.)  The case involving A. Doe was strong, because DNA evidence connected defendant to the offenses and showed that he had engaged in anal intercourse with her, and because A. Doe reported the crimes immediately after they occurred.  The only weaknesses in the A. Doe case involved A. Doe's credibility, due to her subsequent commission of crimes of moral turpitude and some inconsistent details in her versions of the incident.

The case involving R. Doe was not a weaker case.  There were no significant issues with R. Doe's credibility, and, although there was no physical evidence, there was again no question as to defendant's identity.  (Compare *People v. Earle* (2009) 172 Cal.App.4th 372, 402 (*Earle*) [evidence of defendant's identity in one case was "unassailable" but "vulnerable to attack" in second case].)

When assessing the relative strengths and weaknesses of two joined cases, we must keep in mind that "the benefits of joinder are not outweighed—and severance is not required—merely because properly joined charges might make it more difficult for a defendant to avoid conviction compared with his or her chances were the charges to be separately tried.  [Citations.]" (*Soper, supra,* 45 Cal.4th at p. 781.)  Here, both cases were of approximately equal strength.  It was therefore well within the trial court's discretion to find that the relative strengths and weaknesses of the cases did not weigh in favor of severance.

The two cases were also not so dissimilar as to decrease their probative value and require exclusion pursuant to Evidence Code section 352.  Both cases involved non-consensual sex offenses committed against minor female victims.  (Cf. *People v. Escudero* (2010) 183 Cal.App.4th 302, 311 (*Escudero*) [prior rapes of adult women admissible in prosecution for molestation of a child].)  Additionally, "[i]n each instance, defendant took advantage of his female victims when they were vulnerable." (*Ibid.*)  It was not required that the two sets of offenses "have been sufficiently similar to be

15

admissible under Evidence Code section 1101" in order for them to be admissible under Evidence Code section 1108. (*People v. Loy* (2011) 52 Cal.4th 46, 63.) The trial court therefore did not abuse its discretion by determining that the two cases contained sufficient similarities as to make them cross-admissible in separate prosecutions.

In addition, neither case was " ' "likely to unusually inflame the jury against the defendant" ' " such that one case would not be cross-admissible in a separate trial for the other case. (*Hartsch, supra,* 49 Cal.4th at p. 493.) Under Evidence Code section 352, evidence is inflammatory and prejudicial if it " ' "uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues." ' [Citations.]" (*Escudero, supra,* 183 Cal.App.4th at p. 312.) For instance, evidence of an uncharged sex offense may be inflammatory if it involves significantly more "unusual or shocking" abuse than the charged offenses or if the uncharged act evidence is presented in an incomplete manner that is likely to cause the jury to speculate about the prior offense. (*People v. Harris* (1998) 60 Cal.App.4th 727, 738.) Here, both sets of offenses were serious, but the evidence of each set of offenses was not significantly more unusual or shocking than the evidence of the other offenses. The offenses against A. Doe involved forcible sodomy and forcible oral copulation, while the offenses against R. Doe involved forcible lewd acts and forcible penetration. Both victims were young and vulnerable. However, neither victim suffered serious physical harm, and the jury was not left with unexplained details. (Compare *ibid.*) We disagree with defendant's suggestion that because the offenses against A. Doe involved homosexual acts and adultery (since the offenses were apparently committed when defendant was married to S.), there was a danger that the jury would be particularly inflamed. It would be speculative to find that the jurors were likely to have such prejudices. Further, since the offenses against R. Doe involved substantial sexual conduct with a six-year-old child, the trial court could reasonably determine that the

16

evidence in each case was not more inflammatory as compared to the evidence in the other case. (See *People v. Falsetta* (1999) 21 Cal.4th 903, 924 (*Falsetta*).)

Finally, the record does not support defendant's claim that, even if the trial court's severance ruling was correct at the time, defendant suffered actual prejudice from the joinder of the two cases. (See *People v. Johnson* (1988) 47 Cal.3d 576, 591; *Hartsch, supra,* 49 Cal.4th at pp. 494-495.) In making this determination, we may consider whether the evidence underlying the two cases "was relatively straightforward and distinct," whether "the evidence related to each charge was independently ample to support" the convictions, whether there was "any great disparity" in the nature of the two cases, whether the evidence underlying one case "was significantly weaker than that underlying the other," the jury instructions, and closing arguments. (*Soper, supra,* 45 Cal.4th at p. 784.)

Here, the evidence supporting each case was straightforward, consisting of the victim's testimony, evidence of the victim's statements concerning the incident, and, in the case of A. Doe, medical and scientific evidence. The evidence of each case was also distinct from the evidence of the other case, so there was no danger that the jury would not be able to "compartmentalize" the evidence supporting each case during deliberations. (*Soper, supra,* 45 Cal.4th at p. 784.) The evidence of each case was "independently ample to support" the charges. (*Ibid.*) As discussed above, neither case was significantly weaker than the other. Although the jury was not specifically instructed to "consider each count separately" (see CALCRIM No. 3515), the jury instructions defined each crime separately and there were separate verdict forms for each count. Defendant's trial counsel emphasized that the cases were separate and that the jury could not infer that the charges in one case were true based on a finding that the charges in the other case were true. And finally, although the prosecutor told the jury it could consider the fact that two different people had accused defendant of violent sex crimes, the prosecutor did not urge the jury to find that the charges in one case were true because of

17

the evidence supporting the charges in the other case. (Compare *Earle, supra,* 172 Cal.App.4th at pp. 409-410.) Thus, based on our review of the record, joinder of the two cases did not result in " 'gross unfairness' " amounting to a denial of due process. (*Valdez, supra*, 32 Cal.4th at p. 120.)

In sum, we conclude the trial court did not abuse its discretion by denying defendant's severance motion.

### B.      *Exclusion of Reputation Evidence*

Defendant contends the trial court erred by excluding evidence that A. Doe had a reputation for being a "chronic liar" and by denying a discovery request related to that evidence.

#### 1.      **Proceedings Below**

During motions in limine, defendant's trial counsel notified the trial court that she had recently reviewed records from A. Doe's juvenile court file, which had been obtained by defendant's prior counsel, pursuant to a Welfare and Institutions Code section 827 petition.[6] Defendant's trial counsel had just discovered these records, which had been "misfiled" by an intern.

Later in the trial, defendant's trial counsel moved to introduce some of the juvenile court records, which showed that on March 12, 1996, A. Doe had been removed from a foster home for "a variety of reasons," which included that "[s]he was a chronic liar at the time." The records indicated that A. Doe's former foster mother had complained that A. Doe had lied about where she worked, where she would go, and where she got money. Much of the information in the juvenile court records had been redacted, including the name of A. Doe's former foster mother. Defendant's trial counsel had not sought

---

[6] Welfare and Institutions Code section 827 limits the inspection of juvenile case files to specified persons, but provides that "[a]ny other person" (*id*., subd. (a)(1)) may inspect a juvenile case file "upon filing a petition" (*id*., subd. (a)(1)(P)). (See also Cal. Rules of Court, rule 5.552; *People v. Avila* (2006) 38 Cal.4th 491, 606-607.)

18

admission of the "chronic liar" evidence earlier in the trial because she did not think she would be able to "prove it," but defendant had recently been able to "make contact with" and subpoena social worker Pam Erwin, whose notes were included in the juvenile court records. A defense investigator had spoken to Erwin, who was unwilling to discuss the case.

The trial court expressed concern that the social worker's testimony would constitute hearsay. Defendant argued that Erwin could have formed an opinion of A. Doe's character or reputation for truthfulness based on hearsay. The trial court ruled that the social worker could not testify about statements made by the foster mother or "give opinions based on hearsay."

Defendant requested the trial court order that the foster mother's information be unredacted from the juvenile court records. The trial court indicated it believed that the foster mother's testimony would be probative but that it needed to determine whether it had jurisdiction to order that juvenile court records be unredacted.

The trial court later ruled that defendant would need to ask the juvenile court to unredact the records, explaining that one of the juvenile court judges "makes all the decisions about what's released and what's not released on an 827 petition." The trial court noted that if defendant had raised the issue at the trial readiness conference, the court could have ordered a continuance so defendant could request an order unredacting the records. The trial court stated that while defendant was free to contact the juvenile court, it would not continue the trial at that point.

### 2. Exclusion of Social Worker's Testimony

Defendant first contends social worker Erwin's testimony was "admissible as both reputation and as character evidence even if based on hearsay" and thus that the trial court erred by excluding her "opinions based on hearsay." Defendant contends that the exclusion of this evidence violated his rights to confrontation and due process under the Sixth and Fourteenth Amendments.

19

As defendant points out, reputation testimony may be based on hearsay.  (See *People v. McAlpin* (1991) 53 Cal.3d 1289, 1312 ["reputation testimony, the traditional means of proving character, . . . is 'little more than accumulated hearsay' "].)  However, as the Attorney General points out, a person who renders reputation testimony must have a personal opinion about the witness.  (See *People v. Mendoza* (1974) 37 Cal.App.3d 717, 724 [proposed witness was not a "competent witness" on credibility of alleged molestation victim where he did not profess to have knowledge of victim's reputation for honesty].)  "The rule is that evidence of reputation . . . may not be shown by witnesses conducting an inquiry, but must be given by persons having knowledge thereof." (*Orloff v. Los Angeles Turf Club, Inc.* (1951) 36 Cal.2d 734, 739.)

Here, it is not clear from the record whether the social worker herself had an opinion about A. Doe's credibility or reputation for honesty.  Defendant told the court that the social worker "may have an opinion" as to A. Doe's character for truthfulness and that "[i]t may be" that A. Doe had a reputation for being untruthful.  Thus, although it appears that the trial court erred by ruling that the social worker could not "give opinions based on hearsay," defendant has not affirmatively shown that this ruling resulted in the exclusion of evidence that would have been helpful to his defense—i.e., evidence that the social worker in fact had an opinion that A. Doe had a reputation for being untruthful. (See gen., *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [" 'error must be affirmatively shown' " and will not be presumed].)

In sum, defendant has failed to demonstrate the trial court prejudicially erred by ruling that the social worker could not testify as to her opinion about A. Doe's reputation for truthfulness.

### 3.    Jurisdictional Ruling on Redaction

Defendant next contends that the trial court erred by refusing to order the juvenile court records unredacted so that defendant could obtain identifying information about

A. Doe's former foster mother. Defendant contends that the trial court erred by finding it lacked jurisdiction to order the records unredacted.

As defendant acknowledges, Welfare and Institutions section 827, subdivision (a)(1)(P) authorizes disclosure of juvenile court records to non-designated persons only "by court order of the judge of the juvenile court upon filing a petition." Likewise, Santa Clara County Superior Court Local Rules, Juvenile Rule 1(J)(1) provides for discovery of records in a juvenile court file only upon the filing of a "Petition for Disclosure (JV-570) with the Supervising Judge of Juvenile Justice Court." Defendant nevertheless contends that the trial court had the "inherent authority" to order the discovery itself, because the juvenile court is simply part of the superior court. A similar claim was rejected by the court in *Cimarusti v. Superior Court* (2000) 79 Cal.App.4th 799 (*Cimarusti*), where the court held that only a juvenile court was authorized to determine what should be disclosed pursuant to a Welfare and Institutions Code section 827 petition. The court explained: "Judges of the juvenile court are specifically designated to conduct the business of the juvenile court. Superior court judges not so designated may not hear and rule on juvenile court matters." (*Cimarusti, supra,* at p. 805.) Based on *Cimarusti,* we conclude that only judges of the juvenile court designated to conduct the business of the court have the authority to order disclosure of juvenile records.

Alternatively, defendant contends that the trial court had authority to order the District Attorney to obtain the requested information from the unredacted juvenile court files. Defendant points out that Santa Clara County Superior Court Local Rules, Juvenile Rule 1(J)(4)(b)(iv) provides that when a party to a criminal case files and serves a Welfare and Institutions Code section 827 petition on the District Attorney, the District Attorney must lodge a set of unredacted documents with the court. In his reply brief, defendant further argues that the trial court should have ordered the District Attorney to obtain and release the requested information because it was exculpatory evidence falling

21

under *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*). Defendant raised none of these arguments in the trial court, however. By failing to specifically request that the District Attorney be ordered to disclose the documents, and failing to object based on *Brady*, defendant has forfeited these contentions on appeal. (See *People v. Morrison* (2004) 34 Cal.4th 698, 714.)

In sum, defendant has failed to show that the trial court erred by denying defendant's request for an order unredacting A. Doe's juvenile court records.

### C. Exclusion of Prostitution Evidence

Defendant contends the trial court erred by excluding evidence that A. Doe had committed prostitution on a number of occasions subsequent to the charged offenses.

#### 1. Proceedings Below

Defendant filed a written motion in limine seeking to admit acts of prostitution committed by A. Doe after the 1996 incident but before trial. Defendant's trial counsel filed an offer of proof under seal. The offer of proof was a declaration by defendant's trial counsel describing A. Doe's three prostitution convictions (§ 647, subd. (b)) and one conviction of loitering with the intent to commit prostitution (§ 653.22).

The declaration described the offenses as follows. In November of 1998, A. Doe got into a car, which drove to a dead-end street, and was found with a male who had his pants open. In May of 1999, A. Doe got into a car, which drove to an ATM machine, and engaged in oral copulation with a man inside the car. In September of 2007, A. Doe flagged cars down at a bus stop, then got into a car with an undercover officer and told him she would charge $30 for oral sex. In October of 2007, A. Doe tried to flag down cars at a bus stop and then walked to a restroom with a man who had offered her drugs in exchange for sex.

Defendant argued that the prostitution evidence was admissible pursuant to Evidence Code section 1103, subdivision (a), which permits a criminal defendant to introduce "evidence of the character or a trait of character (in the form of an opinion,

evidence of reputation, or evidence of specific instances of conduct) of the victim of the crime for which the defendant is being prosecuted," when such evidence is offered to "prove conduct of the victim in conformity with the character or trait of character" (*id.*, subd. (a)(1)). Defendant also argued that the evidence was admissible under Evidence Code section 1103, subdivision (c)(4), which permits a criminal defendant to introduce rebuttal evidence of a victim's sexual history after the prosecution has introduced evidence of the victim's sexual conduct.

The prosecution filed a written motion in limine seeking to exclude evidence of A. Doe's post-offense sexual history, arguing that evidence of A. Doe's sexual activity with other men was inadmissible pursuant to Evidence Code section 1103, subdivision (c)(1), which prohibits the use of a victim's sexual conduct to prove consent.[7]

At the hearing on the motions, the trial court found that A. Doe's prostitution convictions were relevant, but that their potential for prejudice outweighed their probative value. The trial court ruled that the defense could use the convictions in a "sanitized manner" for impeachment, by referring to them as "misdemeanor crimes of moral turpitude."

Defendant objected, arguing that A. Doe's prostitution convictions were relevant to the question of whether A. Doe had gotten into defendant's car voluntarily. The trial court declined to reconsider its ruling, noting that the defense could impeach A. Doe on this subject, by asking her, "have you ever gotten into a stranger's car without being forced?"

---

[7] Evidence Code section 1103, subdivision (c)(1) provides: "Notwithstanding any other provision of this code to the contrary, and except as provided in this subdivision, in any prosecution [for certain sex offenses], opinion evidence, reputation evidence, and evidence of specific instances of the complaining witness' sexual conduct, or any of that evidence, is not admissible by the defendant in order to prove consent by the complaining witness."

### 2. Analysis

Defendant contends that the trial court's exclusion of the prostitution evidence violated state evidentiary rules as well as his rights to confrontation and due process under the Sixth and Fourteenth Amendments.

"A defendant generally cannot question a sexual assault victim about his or her prior sexual activity. [Citation.] However, a limited exception is applicable if the victim's prior sexual history is relevant to the victim's credibility. [Citations.] In prosecutions [for specified sex offenses], Evidence Code section 782 provides for a strict procedure that includes a hearing outside of the presence of the jury prior to the admission of evidence of the complaining witness's sexual conduct. [Citations.] Evidence Code section 782 is designed to protect victims of molestation from 'embarrassing personal disclosures' unless the defense is able to show in advance that the victim's sexual conduct is relevant to the victim's credibility. [Citation.] If, after review, 'the court finds the evidence relevant and not inadmissible pursuant to Evidence Code section 352, it may make an order stating what evidence may be introduced and the nature of the questions permitted.' [Citation.] 'A trial court's ruling on the admissibility of prior sexual conduct will be overturned on appeal only if appellant can show an abuse of discretion.' [Citation.]" (*People v. Bautista* (2008) 163 Cal.App.4th 762, 781-782 (*Bautista*).)

Defendant relies primarily on *People v. Varona* (1983) 143 Cal.App.3d 566 (*Varona*), in which two defendants were found guilty of rape, oral copulation, and false imprisonment. (*Id.* at p. 568.) The complaining witness had testified that a friend drove her "to within two blocks of a bus stop" and that the defendants attacked her while she was walking to the bus stop. (*Ibid.*) The defendants claimed the woman had solicited them to engage in sex acts for money and had voluntarily engaged in the sexual conduct but became angry upon discovering that the defendants had no money. The trial court excluded evidence that the complaining witness had "earlier, pled guilty to prostitution

and was on probation at the time of trial." (*Ibid.*) The *Varona* court held that the trial court had abused its discretion by excluding the evidence "on the particular facts here involved" because the evidence tended to support the defendants' claim of consent. (*Id.* at p. 569.)

*Varona* was decided prior to the enactment of Evidence Code section 1103, subdivision (c), which specifically prohibits the admission of "evidence of specific instances of the complaining witness' sexual conduct . . . in order to prove consent by the complaining witness." (See Stats. 1991, ch. 16, § 1, eff. March 18, 1991.) Since *Varona* determined that the prostitution evidence should have been admitted on the issue of consent, it has been effectively abrogated by the enactment of Evidence Code section 1103, subdivision (c).

In this case, the trial court found that A. Doe's prostitution convictions were relevant, but that their potential for prejudice outweighed their probative value. The trial court ruled that the prostitution convictions could be admitted if sanitized, so the jury would still learn that A. Doe had been convicted of crimes involving moral turpitude. This ruling was not an abuse of discretion. (See *Bautista, supra,* 163 Cal.App.4th at p. 782.)

The evidence of A. Doe's prostitution conduct had minimal probative value because the incidents all occurred more than two years after the charged offenses and more than five years before trial. Thus, the prostitution evidence did not have significant probative value as to A. Doe's credibility, either at the time she reported the offenses to the police or at the time of her trial testimony. The probative value of the prostitution evidence was also decreased by the fact that the conduct was not similar to the charged offenses. In particular, none of the prostitution incidents involved A. Doe getting into a car that had more than one person in it. "The potential prejudice of this evidence, on the other hand, was substantial. [Citation.]" (*People v. Fontana* (2010) 49 Cal.4th 351, 370 [no abuse of discretion where trial court excluded evidence that sexual assault victim had

25

engaged in intercourse earlier that day].)  Introduction of the evidence would have significantly intruded into A. Doe's private life and could potentially have suggested to some jurors that she was receptive to certain sexual conduct or that she "got what she deserved—neither of which is a rational or permissible inference.  [Citation.]"  (*Ibid.*)  Thus, the trial court did not abuse its discretion by determining that the probative value of the prostitution evidence was substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice.  (See Evid. Code, §§ 352, 782, subd. (a)(4).)

The trial court did admit the prostitution convictions, albeit in a sanitized format.  The trial court permitted defendant to introduce evidence that A. Doe had numerous prior convictions—four misdemeanor offenses involving moral turpitude, providing false information to a peace officer, felony vehicle theft, three counts of battery on a peace officer, and felony grand theft from a person—and that she had voluntarily entered a car with a man on another occasion, which allowed defendant to effectively impeach A. Doe's credibility.  And, because the trial court allowed defendant to cross-examine A. Doe regarding those prior convictions and the prior incident in which she entered another man's vehicle, the trial court's ruling on the prostitution evidence did not violate defendant's rights to confrontation or due process.  (See *Bautista, supra,* 163 Cal.App.4th at p. 783.)

In sum, the trial court's exclusion of the prostitution evidence was not an abuse of discretion, and therefore it was not error.

### D.      *Exclusion of Prior Sexual Assault Claim by A. Doe*

Defendant contends the trial court erred by excluding evidence that, prior to the charged offenses, A. Doe claimed that her stepfather had sexually assaulted her.

#### 1.      **Proceedings Below**

During motions in limine, defendant requested he be permitted to impeach A. Doe with an allegation she made against her stepfather in the fall of 1995, about six months

before the 1996 incident. Defendant's trial counsel indicated she had just obtained the information via a Welfare and Institutions Code section 827 petition. She made the following offer of proof: A. Doe told police that her stepfather had committed forcible oral copulation and sodomy at their home. It appeared that there had not been a prosecution of the stepfather.

Defendant's trial counsel argued that the evidence was admissible pursuant to Evidence Code section 782 to impeach A. Doe and as character evidence. Defendant's trial counsel argued that the evidence would show that A. Doe had knowledge about sexual conduct prior to the alleged offenses.

The prosecutor argued that the evidence had little probative value, that it would cause jury confusion, and that it would necessitate an undue consumption of time because additional witnesses would need to be called.

The trial court agreed that the allegation against A. Doe's stepfather was not relevant, because it was unclear whether or not the allegation was true or false. The trial court specified that it was excluding the evidence pursuant to Evidence Code section 352.

### 2. Analysis

Defendant contends the trial court abused its discretion by excluding the evidence of A. Doe's prior molestation claim because it analyzed the issue "under an incorrect legal standard." He contends the trial court only examined the admissibility of the evidence under Evidence Code section 1103, subdivision (c) and failed to determine whether the evidence was admissible under Evidence Code section 782, which permits a defendant to introduce "evidence of sexual conduct of the complaining witness . . . to attack the credibility of the complaining witness" (*id*., subd. (a)) if the evidence "is relevant pursuant to [Evidence Code] Section 780, and is not inadmissible pursuant to [Evidence Code] Section 352" (*id*., subd. (a)(4)).

The record does not support defendant's claim. As noted above, defendant specifically sought admission of the evidence pursuant to Evidence Code section 782,

27

which requires the trial court to determine if the evidence is relevant and whether it is admissible pursuant to Evidence Code section 352. The trial court specified that it was finding the evidence irrelevant and inadmissible under Evidence Code section 352. Thus, the trial court did not erroneously analyze the admissibility of the evidence under Evidence Code section 1103 only.

Defendant also argues that the trial court failed to understand that a prior sexual act committed upon an alleged child victim is relevant to the child's credibility because it shows that the child did not necessarily learn about sexual conduct from the defendant. He relies primarily on *People v. Daggett* (1990) 225 Cal.App.3d 751 (*Daggett*), where the court explained: "A child's testimony in a molestation case involving oral copulation and sodomy can be given an aura of veracity by his accurate description of the acts. This is because knowledge of such acts may be unexpected in a child who had not been subjected to them. [¶] In such a case it is relevant for the defendant to show that the complaining witness had been subjected to similar acts by others in order to cast doubt upon the conclusion that the child must have learned of these acts through the defendant. Thus, if the acts involved in the prior molestation are similar to the acts of which the defendant stands accused, evidence of the prior molestation is relevant to the credibility of the complaining witness and should be admitted." (*Id.* at p. 757.)

Even if the trial court erred by failing to consider whether the evidence of A. Doe's prior molestation claim should be admitted to show her prior knowledge of sexual conduct, any error was harmless. A prior descriptive claim of sexual molestation, even if false, may be relevant to show that a young child did not necessarily learn of such acts through the defendant. Here, however, the rationale for allowing such evidence was significantly reduced by the fact that A. Doe was not a young child at the time, but a particularly independent and street-wise 16-year-old. The "aura of veracity" that may attach to a young child would not attach to such a 16-year-old, whose awareness of sodomy and oral copulation would not be "unexpected." (*Daggett, supra,* 225

28

Cal.App.3d at p. 757.)  Moreover, the prosecution did not argue that A. Doe could only have learned about oral copulation, sodomy, or other sexual conduct through the offenses committed by defendant and his companion.

Under the circumstances, it is not reasonably probable that the trial court would have allowed the evidence to be admitted on this theory, after analyzing it under Evidence Code section 352, because the evidence had such low probative value as to the issue of A. Doe's prior knowledge of sexual acts and thus as to her credibility in claiming that defendant had sexually assaulted her.  Further, because the evidence of A. Doe's prior molestation claim lacked significant probative value, it is not reasonably probable that defendant would have obtained a different result even if the trial court had admitted that evidence.  (See *People v. Watson* (1956) 46 Cal.2d 818, 836.)

The exclusion of this evidence also did not violate defendant's constitutional right to confrontation.  The trial court's ruling was not a "complete exclusion" of evidence relevant to A. Doe's credibility, since A. Doe was impeached with numerous prior convictions—four misdemeanor offenses involving moral turpitude, providing false information to a peace officer, felony vehicle theft, three counts of battery on a peace officer, and felony grand theft from a person—and inconsistencies in her accounts of the events.  At most, this was " 'the exclusion of defense evidence on a minor or subsidiary point,' " and examination of A. Doe on this particular topic "would not have had a significant impact on defendant's defense or on the jury's impression of [A. Doe's] credibility."  (*Bautista, supra,* 163 Cal.App.4th at p. 783.)

### E.	Jury Instructions on In Concert Offenses

Defendant contends the trial court erred by instructing the jury that sodomy in concert and oral copulation in concert could be committed by duress or menace.  He claims the errors violated his Sixth Amendment right to a jury trial and his Fourteenth Amendment right to due process.

### 1.    Proceedings Below

The trial court instructed the jury on sodomy in concert (§ 286, subd. (d)) pursuant to CALCRIM No. 1031, which stated that the People had to prove that "the defendant personally committed sodomy and voluntarily acted with someone else who aided and abetted its commission." The instruction told the jury to refer to a separate instruction on the crime of sodomy.

The trial court then instructed the jury on the definition of "sodomy by force" pursuant to CALCRIM No. 1030, telling the jury that one of the elements was "the defendant accomplished the act by force, violence, duress, menace or fear of immediate and unlawful bodily injury to another person." The court explained that "[a]n act is accomplished by force if a person uses enough physical force to overcome the other person's will" and that "[a]n act is accomplished by fear if the other person is actually and reasonably afraid she is actually but unreasonably afraid and the defendant knows of her fear and takes advantage of it." The court's instruction also defined the terms "duress" and "menace": "Duress means a direct or implied threat of force, violence, danger, hardship, or retribution that causes a reasonable person to do or submit to something that he or she would not otherwise do or submit to. [¶] When deciding whether the act was accomplished by duress, consider all the circumstances, including the age of the other person and her relationship to the defendant. [¶] Menace means a threat, statement, or act showing an intent to injure someone."

The trial court instructed the jury on oral copulation in concert (§ 288a, subd. (d)) pursuant to CALCRIM No. 1016, again referring the jury to "the separate instructions that I will give you on that crime." Pursuant to CALCRIM No. 1015, the trial court instructed the jury that one element of "oral copulation by force" was that "the defendant accomplished the act by force, violence, duress, menace or fear of immediate and unlawful bodily injury to someone." The instruction defined the terms force, fear, duress, and menace as in the instructions relating to forcible sodomy.

30

### 2. Analysis

At the time of defendant's offenses against A. Doe, former section 286, subdivision (d) provided: "Any person who, while voluntarily acting in concert with another person, either personally or aiding and abetting that other person, commits an act of sodomy when the act is accomplished against the victim's will by means of force or fear of immediate and unlawful bodily injury on the victim or another person or where the act is accomplished against the victim's will by threatening to retaliate in the future against the victim or any other person, and there is a reasonable possibility that the perpetrator will execute the threat, shall be punished by imprisonment in the state prison for five, seven, or nine years." (Stats. 1993-94, 1st Ex. Sess., ch. 40 (A.B. 85), § 2, eff. Nov. 30, 1994.)

At the time of defendant's offenses against A. Doe, former section 288a, subdivision (d) provided: "Any person who, while voluntarily acting in concert with another person, either personally or by aiding and abetting that other person, commits an act of oral copulation (1) when the act is accomplished against the victim's will by means of force or fear of immediate and unlawful bodily injury on the victim or another person, or (2) where the act is accomplished against the victim's will by threatening to retaliate in the future against the victim or any other person, and there is a reasonable possibility that the perpetrator will execute the threat, or (3) where the victim is at the time incapable, because of a mental disorder or developmental or physical disability, of giving legal consent, and this is known or reasonably should be known to the person committing the act, shall be punished by imprisonment in the state prison for five, seven, or nine years. . . ." (Stats. 1993-94, 1st Ex. Sess., ch. 40, § 3, eff. Nov. 30, 1994.)

Forcible sodomy, as defined in section 286, subdivision (c)(2)(A), can be accomplished against a person's will "by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person." Likewise, forcible oral copulation can be accomplished "by means of force, violence, duress,

31

menace, or fear of immediate and unlawful bodily injury on the victim or another person." (§ 288a, subd. (c)(2)(A).)

Defendant contends that the jury was not "legally authorized" to convict him based on the theory that he committed the acts in concert by means of duress or menace. Thus, he contends, the trial court improperly instructed the jury that it could find defendant guilty of the in concert offenses if it found he committed the sodomy and oral copulation with A. Doe by means of force, violence, duress, menace, or fear. He does not dispute that the prosecution introduced evidence from which the jury could have found he committed the acts by force or fear (i.e., the two "legally authorized" theories), but he claims the jury may have instead convicted him based on a finding that he committed the in concert offenses by means of duress or menace.

Respondent contends that the instructions were not incorrect, because under both former section 286, subdivision (d) and former section 288a, subdivision (d), the in concert offenses could be committed "by threatening to retaliate in the future against the victim." Respondent argues that a threat to retaliate "encompass[es] the definitions of duress and menace given [to] the jury."

We need not decide whether the instructions improperly allowed the jury to convict defendant based on a finding that he committed the in concert offenses by means of duress or menace. In view of the entire record, including the evidence, instructions, and arguments of counsel, any instructional error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*); see *People v. Lewis* (2006) 139 Cal.App.4th 874, 884 [when the jury has been instructed on a legally incorrect theory, "the judgment must be reversed unless the People prove beyond a reasonable doubt that the error did not contribute to the verdict"].) Beyond a reasonable doubt, the jury found defendant guilty of sodomy in concert and oral copulation in concert based upon his use of force or fear against A. Doe, not based on duress or menace.

32

First, there was no evidence that defendant committed the in concert offenses by any means other than by force or fear. The evidence showed that defendant's companion forced A. Doe into the car that defendant was driving. While A. Doe tried to push him away, the passenger tried to kiss A. Doe, put his hand under her shirt, and touch her legs. The passenger also used force to pull A. Doe's neck and head towards him, then suck and bite her neck and face. The passenger and defendant called A. Doe a "[b]itch" and the passenger "forced" her to orally copulate him. After defendant got into the back of the car, he and the passenger removed A. Doe's clothing, saw that she had a penis, called her a "faggot," and choked her. Defendant then took out his penis and put it into her anus, which hurt because it was forced. All of these acts were committed by means of force, not by duress or menace. There was no evidence that defendant verbally threatened A. Doe until after the acts were completed. Thus, the record established that if the in concert acts were nonconsensual, they were committed by force, and thus that force was the only basis upon which the jury could have found defendant guilty of the in concert offenses.

Second, the prosecutor did not argue that defendant committed the in concert crimes by means of duress or menace. The prosecutor described how A. Doe was "forced to orally copulate the passenger" and how defendant "forced his erect penis into her rectum." Although the prosecutor noted that A. Doe believed the men were gang members and that she feared them for that reason, the prosecutor never argued that this fear is what enabled defendant and his companion to commit the in concert offenses. Moreover, A. Doe testified that she feared defendant and his companion because they looked like gang members *after* the sexual assault, when they drove her back to the area where they had first accosted her. Neither the evidence nor the prosecutor's argument provided a basis for the jury to convict defendant of the in concert offenses based on that testimony.

Third, the jury found that defendant kidnapped A. Doe, which required a finding that defendant "took, held, or detained [her] by use of force or by inst[i]lling reasonable

fear." The jury's true findings on the kidnapping allegations shows that the jury believed, beyond a reasonable doubt, that defendant used force or fear to accomplish the offenses.

In sum, even if the trial court erred by instructing the jury that the in concert offenses could be committed by means of duress or menace, the record establishes that any error was harmless beyond a reasonable doubt. (*Chapman, supra,* 386 U.S. at p. 24.)

### F. Exclusion of Evidence Concerning R. Doe

Defendant contends the trial court erred by excluding evidence that R. Doe had made a prior claim of being molested and evidence that R. Doe had learned about molestation from a cousin.

#### 1. Proceedings Below

During a hearing early in the trial, defendant sought to introduce evidence that R. Doe had made a prior report of being molested. Defendant argued that the evidence would be relevant both to R. Doe's credibility and to her knowledge of sexual matters. Defendant explained that the evidence would come in through R. Doe's mother, S. The incident had occurred two or three years before the 2000 incident, when R. Doe was about four years old. According to defendant, R. Doe claimed that a family friend had tried to touch her breasts.

Defendant also sought to introduce evidence that around the time of the 2000 incident, R. Doe had learned that her cousin had been molested. Defendant sought to have R. Doe's mother, S., testify that the cousin, who had also been six years old, had been telling people about her molestation in order to get attention, and that the cousin had told R. Doe, "You get preferred treatment when you are a victim." The trial court made a preliminary ruling that this evidence was inadmissible but agreed to hold an Evidence Code section 402 hearing.

The prosecutor filed a written motion to exclude the evidence of R. Doe's prior molestation claim. The prosecutor argued that the prior molestation claim was not

34

relevant because there was no evidence that it was false, and that the evidence should be excluded pursuant to Evidence Code section 352.

At the Evidence Code section 402 hearing, S. testified that she had spoken to the police in 2000, when R. Doe claimed that defendant had molested her. She denied telling the police that R. Doe's cousin had been molested, that the cousin would tell people about it in an attempt to get sympathy, or that R. Doe and the cousin had talked before R. Doe disclosed that defendant had molested her. She denied saying that the cousin "was overheard" telling R. Doe "that you get preferred treatment if you're a victim."

Defendant argued that he should be allowed to impeach S. with her prior statements about the cousin, but the trial court agreed with the prosecutor that it would be impeachment on a collateral issue.

Defendant then addressed the question of whether R. Doe's prior report of being molested was admissible. Defendant acknowledged that there was no evidence her prior report was false, but argued he was not seeking to introduce the evidence as a prior false report. Instead, defendant would introduce the evidence to show R. Doe's "knowledge of the subject matter." He asserted that jurors were likely to think that "children don't know about these things," and that therefore, R. Doe's allegations had to be true.

Defendant argued that exclusion of the evidence would violate his due process right to present a defense. He argued that even though R. Doe's claim would come in through S., the hearsay nature of the statement was irrelevant, since defendant would be introducing the statement only to show it was made, not for its truth. He argued that the two claims were similar, in that they involved a family member (defendant) and a close family friend, and they both involved touching.

The prosecutor argued that a prior rape or molestation allegation is not relevant to a witness's credibility unless the prior allegation is false. The prosecutor also pointed out that the allegations were "fairly different," in that one involved a family friend touching R. Doe's breast and the other involved defendant digitally penetrating her and forcing her

35

to touch his penis. The prosecutor further noted that there was a "three year gap between these two incidents." The prosecutor argued that introduction of the evidence would necessitate undue consumption of time, because even if defendant elicited the evidence from S., the prosecution would need to call additional witnesses to prove the prior molestation had in fact occurred. The prosecutor argued that this would lead to jury confusion.

The trial court found that the probative value of R. Doe's prior molestation claim was "questionable" and "weak," because the evidence would come from S., instead of from R. Doe herself, and because the alleged acts were different. The trial court further indicated it believed that the defense could impeach R. Doe with her prior molestation claim only if the prior claim was false, and proving that would necessitate an undue consumption of time.

During trial, defendant moved to recall S. for the purpose of eliciting her testimony about R. Doe's prior molestation claim. Defendant reiterated that he was not introducing the evidence to show that R. Doe made false molestation allegations but to show that R. Doe had prior knowledge of sexual touching.

The prosecutor reiterated her position that the evidence should be excluded pursuant to Evidence Code section 352, but she also pointed out that the defense had not complied with Evidence Code section 782 by filing a written motion that included an offer of proof as to relevance. The prosecutor further argued that R. Doe's prior allegation was not relevant, since that allegation involved the touching of a breast, whereas the charged offenses involved other acts: "Touching of the breast would not show [R. Doe's] knowledge of penetration of the vagina. It would not show her knowledge of kissing on the lips with the tongue. It would not show her knowledge of touching the defendant's penis."

The trial court declined to change its prior ruling and specified that it was excluding the evidence pursuant to Evidence Code section 352, not defendant's failure to

36

comply with Evidence Code section 782. The trial court indicated it understood that defendant was seeking to admit the evidence to show R. Doe's "knowledge of certain sexual acts," but pointed out that R. Doe's original allegations had not included anything about defendant touching her breast. For that reason, the trial court found that S.'s testimony about R. Doe's prior allegation would not impeach R. Doe's credibility "in terms of her knowledge of sexual acts."

The trial court explained why it found the probative value of the evidence to be "weak." First, "the statement was not from the victim, it was from the mother." Second, there was "barely any similarity of the acts." Third, R. Doe "did not describe the acts in detail" when she initially complained about defendant molesting her. The trial court then explained why the evidence was potentially prejudicial: the jury might "draw a wrong conclusion from the prior evidence in the sense that they could use it to discredit [R. Doe's] credibility, even where it's not proved false . . . ."

### 2.    Analysis

Defendant contends the trial court abused its discretion and violated his constitutional rights to confrontation and due process when it precluded him from eliciting evidence that R. Doe had previous knowledge about molestation.

Defendant first argues that the trial court failed to consider whether the evidence was admissible to show that R. Doe did not necessarily learn about sexual conduct from defendant, and that the admissibility of that evidence did not depend on whether R. Doe's prior molestation claim was true or false. (See *Daggett, supra,* 225 Cal.App.3d at p. 757.) The record does not support this claim. As noted above, the trial court indicated it understood that defendant was seeking to admit the evidence to show R. Doe's "knowledge of certain sexual acts," and it ruled that the evidence was too dissimilar to impeach R. Doe's credibility "in terms of her knowledge of sexual acts."

Defendant next contends that the trial court should have held a hearing "to explore the impact of the prior molestation on R.[ Doe]'s current report of molestation." He

37

relies on *Daggett,* in which the trial court erred by failing to hold a hearing on the admissibility of prior molestation evidence. However, *Daggett* is distinguishable. First, in that case, the defendant filed a written motion to introduce the evidence, which under Evidence Code section 782 is a prerequisite to holding a hearing.[8] (See *Daggett, supra,* 225 Cal.App.3d at pp. 754, 757.) Second, in *Daggett*, the defendant's offer of proof was that the victim had previously been "molested," but he did not further describe the acts, such that a hearing was necessary in order for the trial court to determine whether those acts "were sufficiently similar" to the charged acts as to be admissible. (*Id.* at p. 757.) Here, the nature of the prior acts was known to the trial court, and the trial court could determine, without a hearing, whether they were sufficiently similar to the acts defendant was accused of committing.

Next, defendant contends the trial court erred by "excluding and prohibiting cross-examination with" the evidence that R. Doe heard that her cousin had been molested and that being a victim resulted in better treatment. Defendant contends this was "crucial"

---

[8] Evidence Code section 782, subdivision (a) specifies that "if evidence of sexual conduct of the complaining witness is offered to attack the credibility of the complaining witness under Section 780, the following procedure shall be followed: [¶] (1) A written motion shall be made by the defendant to the court and prosecutor stating that the defense has an offer of proof of the relevancy of evidence of the sexual conduct of the complaining witness proposed to be presented and its relevancy in attacking the credibility of the complaining witness. [¶] (2) The written motion shall be accompanied by an affidavit in which the offer of proof shall be stated. The affidavit shall be filed under seal and only unsealed by the court to determine if the offer of proof is sufficient to order a hearing pursuant to paragraph (3). After that determination, the affidavit shall be resealed by the court. [¶] (3) If the court finds that the offer of proof is sufficient, the court shall order a hearing out of the presence of the jury, if any, and at the hearing allow the questioning of the complaining witness regarding the offer of proof made by the defendant. [¶] (4) At the conclusion of the hearing, if the court finds that evidence proposed to be offered by the defendant regarding the sexual conduct of the complaining witness is relevant pursuant to Section 780, and is not inadmissible pursuant to Section 352, the court may make an order stating what evidence may be introduced by the defendant, and the nature of the questions to be permitted. The defendant may then offer evidence pursuant to the order of the court. . . ."

38

evidence that explained why R. Doe accused defendant of molesting her. However, at the Evidence Code section 402 hearing, S. denied making any statements about R. Doe's cousin having been molested. Thus, the evidence could only have come in through cross-examination of S., to impeach her with her prior inconsistent statements; it would not have been admitted to impeach R. Doe herself. It was well within the trial court's discretion to preclude defendant from impeaching S. in this manner. (See *People v. Contreras* (2013) 58 Cal.4th 123, 152 (*Contreras*) [trial court did not err by precluding defense from impeaching teenage witness with report cards that would have contradicted testimony about his performance in school after the homicide].)

Finally, the rulings did not violate defendant's constitutional rights to confrontation and due process. First, because R. Doe's two molestation claims were not similar, the excluded evidence of her prior molestation claim was not significantly probative on the issue of her preexisting knowledge of sexual acts and thus would not have produced a " ' " 'significantly different impression' " ' " of her credibility. (*Contreras, supra,* 58 Cal.4th at p. 152; see *Daggett, supra,* 225 Cal.App.3d at p. 757.) Similarly, because evidence about the cousin's molestation and statements would only have come in to impeach S., the trial court's ruling did not impermissibly interfere with defendant's trial rights.

In sum, we find no error in the trial court's decision to exclude evidence that R. Doe had made a prior claim of being molested, nor in its decision to exclude evidence that R. Doe had learned about molestation from a cousin.

### G.    *Ineffective Assistance of Counsel*

Defendant contends his trial counsel was ineffective for failing to: (1) conduct adequate pretrial investigation; (2) request a limiting instruction concerning propensity evidence; (3) raise certain objections under the federal Constitution; and (4) object to prosecutorial misconduct.

## 1.    Standard for Ineffective Assistance of Counsel Claims

" 'In order to establish a claim of ineffective assistance of counsel, defendant bears the burden of demonstrating, first, that counsel's performance was deficient because it "fell below an objective standard of reasonableness [¶] . . . under prevailing professional norms." [Citations.] Unless a defendant establishes the contrary, we shall presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." [Citation.] If the record "sheds no light on why counsel acted or failed to act in the manner challenged," an appellate claim of ineffective assistance of counsel must be rejected "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation." [Citations.] If a defendant meets the burden of establishing that counsel's performance was deficient, he or she also must show that counsel's deficiencies resulted in prejudice, that is, a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." [Citation.]' [Citation.]" (*People v. Lopez* (2008) 42 Cal.4th 960, 966 (*Lopez*); see *Strickland v. Washington* (1984) 466 U.S. 668, 690, 694.)

## 2.    Failure to Conduct Adequate Pretrial Investigation

Defendant contends his trial counsel was ineffective because she failed to conduct adequate pretrial investigation, in that she failed to (1) timely realize that her own case file included the "chronic liar" evidence obtained by defendant's prior counsel, (2) present the trial court with legal authority supporting the admission of that evidence, and (3) present the trial court with legal authority supporting the issuance of an order disclosing the identity of A. Doe's foster mother.

With regard to trial counsel's failure to find the "chronic liar" evidence, which was in her own file, defendant points out that deficient performance has been found where a trial attorney failed "to review the file of the previous attorneys who handled the charges in the same case," when that file contained exculpatory evidence and "led to a failure to

40

present a key witness to the jury." (*Vega v. Ryan* (9th Cir. 2014) 757 F.3d 960, 967, 968, italics omitted.) In this case, however, the record does not show that Erwin, the social worker, was a "key witness," or even that she would have provided any helpful evidence to the defense case. (*Id.* at p. 968.) As we explained above, it was not clear that the "chronic liar" opinion came from Erwin or that Erwin had her own opinion about A. Doe's character for truthfulness. (See p. 18, *ante.*) Thus, on this record, defendant has not demonstrated prejudice with respect to his trial counsel's failure to find the "chronic liar" evidence in her file before the trial began.

The same is true for defendant's claim that his trial counsel was ineffective for failing to provide the trial court with legal authority supporting his argument that reputation evidence may be based on hearsay. Even assuming that he has shown deficient performance, defendant has not demonstrated prejudice because the record does not show that Erwin would have presented testimony that would have been helpful to his defense. (See *Lopez, supra,* 42 Cal.4th at p. 966.)

We also find no merit to defendant's claim that his trial counsel was ineffective for failing to provide the trial court with legal authority supporting his request for a court order unredacting the foster mother's name. As the Attorney General points out, defendant's claim assumes that the foster mother could have been located and that she would have given testimony that was consistent with the social worker's report. Based on the appellate record, we cannot determine whether "particular witnesses were ready, willing and able" to testify. (See *People v. Medina* (1995) 11 Cal.4th 694, 773.) Thus, defendant has not made the required showing of prejudice. (See *Lopez, supra,* 42 Cal.4th at p. 966.)

In sum, defendant has not established that trial counsel was ineffective for failing to conduct adequate pretrial investigation.

### 3. Failure to Request a Limiting Instruction

Defendant contends his trial counsel was ineffective because she failed to request a limiting instruction concerning propensity evidence. Relying on *People v. Villatoro* (2012) 54 Cal.4th 1152 (*Villatoro*), defendant argues that the jury should have been told (1) that it could not find defendant guilty of one charged offense simply because it found him guilty of another charged offense, and (2) that it had to find that the elements of each offense had been proven beyond a reasonable doubt before it could consider one offense as proof of another offense.[9]

In *Villatoro,* the defendant was charged with committing various sex offenses, including rape and sodomy, against five women. (*Villatoro, supra,* 54 Cal.4th at p. 1156.) The trial court had instructed the jury with a modified version of CALCRIM No. 1191, which explains how uncharged sex offenses can be considered as propensity evidence under Evidence Code section 1108. The modified instruction given in *Villatoro* told the jury that if it found that the defendant committed one of the charged rape or sodomy offenses, it could find that he " 'was disposed or inclined to commit the other charged crimes of rape or sodomy, and based on that decision also conclude that the defendant was likely to and did commit the other offenses of rape and sodomy charged.' " (*Villatoro, supra,* at p. 1167.) The instruction specified, however, that such a conclusion would be " 'only one factor to consider along with all the other evidence' " and was " 'not sufficient by itself to prove the defendant is guilty of another charged offense.' " (*Ibid.*) Finally, the instruction stated, " 'The People must still prove each element of every charge beyond a reasonable doubt and prove it beyond a reasonable

---

[9] "The trial court has no sua sponte duty to give a limiting instruction on cross-admissible evidence in a trial of multiple crimes. [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 394; see also *Falsetta, supra,* 21 Cal.4th at pp. 923-924 [no sua sponte duty to give limiting instruction as to other crimes evidence admitted pursuant to Evidence Code section 1108].)

doubt before you may consider one charge as proof of another charge.' " (*Ibid.*, fn. omitted.)

The *Villatoro* defendant argued that the trial court should not have given the modified instruction, because the instruction did not clearly designate the standard of proof applicable when the charged offenses were being used as propensity evidence. (*Villatoro, supra,* 54 Cal.4th at p. 1167.) The California Supreme Court disagreed, holding that "the instruction clearly told the jury that all offenses must be proven beyond a reasonable doubt, even those used to draw an inference of propensity." (*Id.* at p. 1168.) Moreover, the jury had been instructed on the requirement of proof beyond a reasonable doubt pursuant to CALCRIM No. 220. (*Ibid.*)

*Villatoro* does not establish that an effective attorney must request a limiting instruction whenever separate offenses are cross-admissible in a joint trial. *Villatoro* holds only that the modified version of CALCRIM No. 1191 given in that case "did not impermissibly lower the standard of proof or otherwise interfere with [the] defendant's presumption of innocence." (*Villatoro*, *supra*, 54 Cal.4th at p. 1168.)

Here, the trial court never instructed the jury that the offenses were cross-admissible as propensity evidence—i.e., that if the jury found that the defendant committed one of the charged offenses, it could find that he " 'was disposed or inclined to commit the other charged crimes . . . and based on that decision also conclude that the defendant was likely to and did commit the other offenses . . . .' " (*Villatoro, supra*, 54 Cal.4th at p. 1167.) Because the jury was not instructed that it could use the charged offenses as propensity evidence, trial counsel was not deficient in failing to ask that the jury be instructed that it had to find a charged offense beyond a reasonable doubt before using that offense as propensity evidence as to the other offenses.

### 4. Failure to Raise Federal Constitutional Objections

Defendant contends his trial counsel was ineffective because she failed to raise certain objections under the federal Constitution. Specifically, defendant complains that

his trial counsel should have raised contemporaneous Confrontation Clause and due process objections when the trial court excluded the evidence that A. Doe had a reputation as a "chronic liar," the evidence of A. Doe's prostitution convictions, the evidence of A. Doe's allegation against her stepfather, and the evidence that R. Doe's cousin had told her about being molested.

While trial counsel may in some instances have failed to raise federal constitutional arguments when orally arguing the evidentiary motions, in her written motions in limine, defendant's trial counsel argued that it would be federal constitutional error to exclude the evidence she was seeking to introduce. Defendant's trial counsel also requested that all of her objections at trial be deemed to include objections on the ground that the error violated defendant's state and federal constitutional rights. As to the evidentiary issues that defendant raises on appeal, we have not concluded that defendant forfeited any arguments by failing to object on federal constitutional grounds. (Cf. *People v. Partida* (2005) 37 Cal.4th 428, 435 [on appeal, a defendant may argue that an asserted evidentiary ruling, if raised below on statutory grounds, "had the additional legal consequence of violating due process"].) Therefore, trial counsel was not ineffective for failing to make such objections.

### 5.      Failure to Object to Prosecutorial Misconduct

Defendant contends his trial counsel was ineffective because she failed to object to seven instances of alleged prosecutorial misconduct, all of which occurred during argument to the jury.

The general rules applying to claims of prosecutorial misconduct are as follows: "Under the federal Constitution, to be reversible, a prosecutor's improper comments must ' "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process." ' [Citations.] ' "But conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or

the jury." ' " [Citations.]' [Citation.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1000 (*Cunningham*).) When the claim of prosecutorial misconduct "is based upon 'comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion. [Citation.]' [Citations.]" (*Id.* at p. 1001.)

"Keeping in mind that '[a]n attorney may choose not to object for many reasons, and the failure to object rarely establishes ineffectiveness of counsel' [citation], we examine each instance of alleged misconduct." (*People v. Williams* (1997) 16 Cal.4th 153, 221 (*Williams*).)

### a. Remarks About Second Perpetrator

Defendant first complains that the prosecutor told the jury that it was "only seeing one" of the perpetrators of the A. Doe offenses "because we don't know who that second person is." Defendant contends that "[t]his was an erroneous reference to matters outside the record and was an unlawful attempt [to] engage the jury's sense of outrage toward [defendant] for his obvious refusal to tell law enforcement 'who that second person is.' "

In context, there is no reasonable likelihood that the jury construed the prosecutor's remarks in the manner suggested by defendant. (See *Cunningham, supra,* 25 Cal.4th at p. 1001.) There was no evidence that defendant refused to name the second perpetrator, and the prosecutor did not argue or suggest that defendant had withheld that information. The evidence did establish that there was a second perpetrator, whose DNA was found in A. Doe's mouth, and who A. Doe described to a police sketch artist. The prosecutor's reference to the unidentified second perpetrator was therefore well within the " ' "wide latitude" ' " given to the prosecutor during argument, and may properly be characterized as " ' "fair comment on the evidence." ' " (*Williams, supra,* 16 Cal.4th at p. 221.)

### b. *Remarks About Defendant's Other Children*

Defendant complains that the prosecutor told the jury that defendant's children were all "taken away from him" and put into foster homes, and that he never "got them back." Defendant contends this was a misstatement of the evidence, and he contends that the prosecutor was, in essence, urging the jury to feel pity for R. Doe's family, sympathize with R. Doe, and feel "outrage and disgust" toward defendant.

The prosecutor made the challenged remarks when discussing the testimony of defendant's sisters, who both asserted that they had not noticed defendant treating R. Doe differently than his own children. The prosecutor asked, "He treated [R. Doe] like his own children? Well, how well did he treat his own children? They were taken away from him. They were put into foster homes. He never got them back."

The prosecutor's remarks did not misstate the evidence. R. Doe testified that she was placed into foster care at age eight and a half, and that she lived with her siblings in foster care. R. Doe also testified that her siblings were all subsequently adopted. We acknowledge that the prosecutor's remarks may have suggested that defendant's children were "taken away from him" because he mistreated them. Nevertheless, there is no " 'reasonable likelihood' " that the jury construed the prosecutor's remarks in the manner suggested by defendant—i.e., as an appeal for the jury to feel particularly sympathetic towards R. Doe or to punish defendant for uncharged acts. (See *Cunningham, supra,* 25 Cal.4th at p. 1001.)

### c. *Remarks About Defendant Being in Mexico*

Defendant complains that the prosecutor told the jury that defendant was in Mexico from 2006 to 2011 and that a search warrant was obtained when he returned to the United States. Defendant argues that these were references to facts not in evidence, and he complains that the effect of the prosecutor's comments was the improper suggestion that defendant was not a United States citizen. He also complains that the

46

prosecutor's comments, combined with the flight instruction, "allowed the jury to infer a consciousness of guilt."

During motions in limine, the parties agreed "that it could be discussed that [defendant] was out of the country for a period of time in Mexico, returned to the country, and essentially the investigation and prosecution picked up at that point." The parties further agreed that while the jury could learn that defendant's DNA was taken "upon his return to the country," the parties could not say "why it was collected at that time," and they could not use words that would "allude to deportation."

The prosecutor made the challenged remarks when discussing the DNA evidence linking defendant to the offenses involving A. Doe. The prosecutor noted that the DNA samples had been sent to a database, but that a match was not made until "[t]en years later." The prosecutor said, "So that match in 2006, well, the defendant was in Mexico at the time. But in 2011 when he returned to the U.S., investigators from the Santa Clara County District Attorney's Office Bureau of Investigation were able to get a search warrant."

Defendant's trial counsel responded to these remarks during her argument to the jury. She argued that the prosecutor had "tried to play on your emotions a little with talks about justice delayed for [A. Doe] and [R. Doe]." She urged the jury not to "be swayed" by the prosecutor's "subtle play on your emotions." She then argued: "When you go back into that room, consider only the evidence, only the evidence that came from that witness stand or the exhibits. The district attorney stood up and talked to you in her opening and closing statements. And she has said things that were not part of the evidence in this case. She told you yesterday, and in opening, that [defendant] was in Mexico, and that's why there was a delay in this case. [¶] There was no evidence that [defendant] was in Mexico. That was never presented. There was nothing of the sort presented from any witness who took the stand."

In light of the above argument, the record indicates that defendant's trial counsel made a tactical decision not to object, but rather to respond to the prosecutor's assertions during her own closing argument. (See *People v. Welch* (1999) 20 Cal.4th 701, 764 (*Welch*); *People v. Riel* (2000) 22 Cal.4th 1153, 1197 ["competent counsel may often choose to forgo even a valid objection"].) It was not unreasonable for defendant's trial counsel to believe that it would be more effective to point out that the prosecutor was trying to "sway[]" the jury with facts that had not been presented, and to remind the jurors of their duty to consider only the evidence presented at trial. By countering the prosecutor's improper argument, defendant's trial counsel demonstrated that she "was aware of the misstatements and, in exercising reasonable professional judgment, chose not to object for tactical reasons." (*People v. Sanchez* (1995) 12 Cal.4th 1, 71 (*Sanchez*), disapproved of on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

Even if trial counsel had no tactical reason for failing to object, the prosecutor's brief reference to defendant being in Mexico from 2006 to 2011 was not likely to convey to the jury the improper suggestion that defendant should be punished or distrusted because he was not a United States citizen, nor to suggest that defendant had fled. Thus, even if trial counsel should have objected and requested a curative admonition, there is no " ' "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." [Citation.]' [Citation.]" (*Lopez, supra,* 42 Cal.4th at p. 966.)

### d.     Remarks About Delayed Prosecution of R. Doe Case

Defendant complains that the prosecutor told the jury that no follow-up investigation was done on R. Doe's case because it "got lost" between the Morgan Hill and San Jose police departments. Again, defendant contends this statement was not supported by the evidence, and he argues that it was "an erroneous attempt to engage the jury's sense of sympathy for R. [Doe] and to blame police for delaying the case . . . ."

48

Defendant's trial counsel addressed this issue in her argument to the jury as follows: "There was also some argument or comments in the opening statements about the fact that the ball was dropped in [R. Doe's] case. That the San Jose police were supposed to hand it off to someone else, and that never happened. There was no evidence of that either, Ladies and Gentlemen. You didn't hear from any witnesses who work for the Morgan Hill Police Department. And you didn't hear from any witnesses from the San Jose Police Department, who testified that they were handing it off. [¶] The only witness who said anything about that was Officer Martinez. And he told you very clearly repeatedly that after he did his initial interview, he didn't know what happened with it. He notified the detectives from the sexual assault unit, and that was the end of his involvement."

Thus, the record again indicates that defendant's trial counsel made a tactical decision not to object, but rather to respond to the prosecutor's assertions during her own closing argument. (See *Welch, supra,* 20 Cal.4th at p. 764.) It appears defendant's trial counsel felt it would be more effective to point out that the prosecutor was trying to mislead the jury with facts that had not been presented than to object. The response from defendant's trial counsel, in which she pointed to specific testimony on the issue, demonstrated that she "was aware of the misstatements and, in exercising reasonable professional judgment, chose not to object for tactical reasons." (*Sanchez, supra,* 12 Cal.4th at p. 71.)

Moreover, even if trial counsel had no tactical reason for failing to object, in context, there is no reasonable likelihood that the jury construed the prosecutor's remarks in the manner suggested by defendant. (See *Cunningham, supra,* 25 Cal.4th at p. 1001.) The prosecutor's brief reference to the lack of follow-up by the police was not likely to convey to the jury improper suggestion that this somehow made R. Doe more sympathetic. Thus, even if trial counsel should have objected, there is no " ' "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

49

would have been different." [Citation.]' [Citation.]" (*Lopez, supra,* 42 Cal.4th at p. 966.)

### e. Remarks About Joined Cases

Defendant complains that the prosecutor told the jury, during closing argument, that it was permissible to consider the fact that two people (A. Doe and R. Doe) had accused defendant of committing violent sex crimes. Defendant contends that the prosecutor thereby "exploited the absence of the Evidence Code section 1108 limiting instruction," misrepresented the law, and misrepresented the burden of proof.

The prosecutor's challenged remarks were responsive to an argument made by defendant's trial counsel. Defendant's trial counsel had asked the jury "to disregard the fact that these two very different cases are being tried together and examine each case individually on its own merits." Defendant's trial counsel had argued that the prosecution had joined the A. Doe and R. Doe cases together "in the hope that you'll ignore the problems with each, the inconsistencies in each, and just assume that, if [defendant has] been accused by two people, then he must be the monster that they would like him to be." Defendant's trial counsel told the jury that the prosecutor "may argue to you that, if you believe [defendant] committed one of the offenses, then you can conclude that he must have committed the other, that he has sort of a propensity or disposition to commit sex offenses." She warned the jury to be "wary of this type of argument" and argued that "the people who molest children [are not] the same people that commit violent rapes."

The prosecutor responded to the above argument, stating: "If it wasn't legal for you to hear these two cases together, . . . the Court wouldn't allow you to do it. The defense has suggested that somehow a weak case and another weak case have been put together and that there's something nefarious about that. If for some reason those cases couldn't be heard together, you would not hear them together. It is not just one person who has accused the defendant of a violent sexual crime. It is two people. You can

50

consider that. [¶] If it was not legal for you to consider it, the Court would not have put those two cases together."

Defendant contends the prosecutor misstated the law, relying on *Villatoro, supra,* 54 Cal.4th 1152. However, the prosecutor never told the jury that if it found that the defendant committed one of the charged rape or sodomy offenses, it could find that he had a propensity to commit the other charged crimes, which is what the challenged instruction in *Villatoro* stated. (*Id.* at p. 1167.) The prosecutor simply told the jury that it could "consider" the fact that defendant had been accused of two separate sets of offenses, which was not improper. (See CALCRIM No. 1191 [if the jury concludes that the defendant committed an uncharged sex offense, "that conclusion is only one factor to consider along with all the other evidence" and is "not sufficient by itself to prove the defendant is guilty" of another offense].) The prosecutor did not improperly tell the jury that it could find defendant guilty of one set of offenses based only on its finding that he was guilty of the other set of offenses. Since the prosecutor did not misstate the law or the burden of proof, defendant's trial counsel was not ineffective for failing to object.

### f. *Remarks About Lack of Evidence*

Defendant complains that the prosecutor told the jury that there was no evidence providing a reason for A. Doe or R. Doe to make up their allegations, no evidence that R. Doe was an attention-seeker, and no evidence that A. Doe was "cruising around for sexual favors." Defendant asserts that this was improper argument because the prosecutor knew that these matters would have been shown by evidence the trial court had excluded.

First, in discussing R. Doe, the prosecutor noted that the defense had suggested that "sometimes kids tell stories" and that "maybe some kids are just attention seekers." The prosecutor asserted there was no evidence that R. Doe was "telling a story" and no evidence that she "was one of those children who sought attention and therefore made up

51

stories to get more attention." Arguably, these comments related to the excluded evidence that R. Doe learned, from her cousin, that victims get preferred treatment.

Second, in discussing A. Doe, the prosecutor noted that the defense had suggested that "well, she's just cruising around for sexual favors and had a one-night stand with the defendant." The prosecutor asked, "Did you hear any evidence of that, that she was just cruising around for a sexual favor? Did you hear any evidence that she had a one-night stand with the defendant? The defense is asking you to base a verdict on things that you haven't heard, on things that are not evidence." Arguably, these comments related to the excluded evidence that A. Doe had engaged in prostitution two years after the incident.

At the very end of her closing argument, the prosecutor told the jury not to speculate, but to look at the evidence. The prosecutor acknowledged that "people lie" for various reasons, but asserted, "The defense has not given you one good reason in this case why [A.] Doe would lie. Why [R. Doe] would make up a story. The evidence is not there." These comments arguably referred to evidence that the trial court had excluded: evidence that A. Doe was a "chronic liar," and evidence that R. Doe had learned that victims get preferred treatment.

Defendant points out that in *Varona, supra,* 143 Cal.App.3d 566, the prosecutor committed misconduct by arguing there was no evidence that the victim was a prostitute, because he knew such evidence existed but that it had been excluded by the trial court. (*Id.* at p. 570.) In that case, the appellate court held that the trial court's evidentiary ruling had been erroneous. (*Id.* at pp. 569-570.) Subsequent to *Varona,* the California Supreme Court has explained that a prosecutor does not commit misconduct by arguing a lack of evidence when the trial court has *properly* excluded the evidence at issue. (*People v. Lawley* (2002) 27 Cal.4th 102, 156 (*Lawley*).)

The *Lawley* defendant, who was charged with murder, sought to introduce evidence that another person, Brian Seabourn, had claimed to have killed the victim for pay. (*Lawley, supra,* 27 Cal.4th at pp. 151-152.) The trial court excluded the portion of

52

Seabourn's statement that described payment for the murder. (*Id.* at p. 152.) The California Supreme Court then upheld that ruling. (*Id.* at p. 155.) The court also rejected the defendant's claim that the prosecutor had committed misconduct by asserting that there was no evidence that Seabourn had a motive for committing the murder. The court explained that there was no misconduct because "the prosecutor's argument constituted fair comment on the evidence, following evidentiary rulings we have upheld." (*Id.* at p. 156.) The court further held that *Varona* was "inapposite" because it involved an "erroneous evidentiary ruling[] on which the prosecutor improperly capitalized during his closing argument." (*Ibid.*)

In this case, the prosecutor's challenged remarks also can be characterized as "fair comment on the evidence, following evidentiary rulings we have upheld." (*Lawley, supra,* 27 Cal.4th at p. 156.) Unlike in *Varona,* the prosecutor's challenged remarks did not capitalize on the improper exclusion of evidence, since we found no abuse of discretion in any of the trial court's challenged evidentiary rulings. Thus, the prosecutor did not commit misconduct, and trial counsel was therefore not ineffective for failing to object.

        *g.*     *Remarks About A. Doe Believing Assailants Were Gang Members*

Finally, defendant complains that the prosecutor elicited evidence that A. Doe believed defendant and his companion were gang members, then argued that this evidence could support a finding that the offenses were committed by means of fear.

On direct examination, the prosecutor asked A. Doe about how she reacted when she saw defendant get out of the car and go to the trunk. A. Doe testified that she "freaked out" and thought she was going to die because the perpetrators both "looked like gangsters."

On cross-examination, defendant's trial counsel repeatedly asked A. Doe whether she fought back or resisted during the assault. A. Doe testified that she resisted and fought back during the entire assault by trying to pull away, but not by pushing or

kicking. She explained, "My fighting back is different than what you are probably thinking. If I fought back, it would have been worse. So I didn't hit. I just pulled, resisted, tried to get away."

On redirect examination, the prosecutor asked A. Doe to again explain why she had not fought back by punching or kicking her assailants. A. Doe testified that "it probably would have been worse" for her to fight back, because it would have revealed her sexuality, and because "[t]hey were gangster looking." She explained that she believed the assailants were Sureños because they spoke Spanish and wore a particular brand of baggie clothing.

During argument to the jury, the prosecutor referenced A. Doe's testimony about being afraid when defendant went to the trunk of his car: "She was afraid of them. She said that they were dressed like cholos. That they were dressed like Surenos, Hispanic criminal street gang. . . ."

During closing argument, the prosecutor referenced the defense claim that A. Doe's story was not credible because she had "barely fought back" during the assault. The prosecutor noted that a sexual assault victim is not required to "get in a physical confrontation" with his or her assailants, and she referenced A. Doe's explanation for not fighting back: "Well, she's a man. She's 16 years old. Defendant was a man. She perceived these to be two [S]ureno gang members. And that made her frightened of them."

Contrary to defendant's claim, the prosecutor did not characterize defendant as a gang member. The prosecutor stated only that A. Doe perceived her assailants to be gang members. Thus, this case is distinguishable from the case defendant relies on, *People v. Cardenas* (1982) 31 Cal.3d 897, in which the trial court erroneously allowed the prosecution to introduce evidence that the defendant was a member of a specific gang. (*Id.* at p. 904.)

Nor did the prosecutor argue that defendant was guilty of the charged offenses based on A. Doe's belief that her assailants were gang members. Although the prosecutor mentioned A. Doe's fear, she did not argue that this evidence provided a basis for the jury to find that the charged offenses were committed by force or fear. The prosecutor referenced A. Doe's fear only in response to the defense's argument regarding the credibility of A. Doe's description of the assault.

In sum, the prosecutor did not commit misconduct by eliciting or referring to gang evidence, and, therefore, trial counsel was not ineffective for failing to object.

### H.      Cumulative Error

Defendant claims that the cumulative effect of all the errors requires reversal. (See *People v. Hill* (1998) 17 Cal.4th 800, 844 (*Hill*) ["a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error"].)

As to most of defendant's claims, we have found no error. We have concluded that even if the trial court erred by failing to consider whether A. Doe's prior molestation claim was admissible to show her prior knowledge of sexual conduct, the error was harmless. We have also concluded that even if the trial court gave erroneous instructions on the in concert offenses, the error was harmless. Even when we consider these two instances of possible error together, defendant's trial was one "in which his guilt or innocence was fairly adjudicated." (*Hill, supra,* 17 Cal.4th at p. 844.) This case is not like *Hill,* in which "outrageous and pervasive misconduct" by the prosecutor led the court to reverse the judgment in a trial that was "rife with serious error." (*Id.* at p. 815.) Here, the two potential errors were unrelated and did not raise any "possibility the aggregate prejudicial effect of such errors was greater than the sum of the prejudice of each error standing alone." (*Id.* at p. 845.) Thus, we find no cumulative error.

*I.      Restitution Fine*

Defendant contends that the trial court erred by imposing a $10,000 restitution fund fine without considering defendant's ability to pay.

### 1.      Proceedings Below

At the sentencing hearing, the trial court imposed a $10,000 restitution fine "under the formula permitted by Penal Code Section 1202.4(b)(2)." Defendant argued that he would have no ability to pay any fees and fines because he had no source of income and was being sentenced to prison for 38 years to life. The trial court agreed to suspend four of the other fees and fines it had imposed, including an AIDS education fine. However, the trial court declined to reduce the restitution fine, finding that defendant "deserves every penalty . . . ." The trial court ordered the Department of Corrections "to collect money from any earnings that [defendant] makes while in prison to be paid toward that restitution fine."

### 2.      Analysis

Section 1202.4, subdivision (b) requires the trial court to impose a restitution fine "[i]n every case where a person is convicted of a crime, . . . unless it finds compelling and extraordinary reasons for not doing so and states those reasons on the record." The amount of the restitution fine "shall be set at the discretion of the court and commensurate with the seriousness of the offense." (§ 1202.4, subd. (b)(1).)

At the time of defendant's offenses, the minimum amount of the restitution fine was $200. (Stats. 1996, ch. 629, § 3; Stats. 1999, ch. 584, § 4.) Under section 1202.4, subdivision (b)(2), the trial court "may determine the amount of the fine as the product of the minimum fine . . . multiplied by the number of years of imprisonment the defendant is ordered to serve, multiplied by the number of felony counts of which the defendant is convicted."

Under section 1202.4, subdivision (d), in setting the fine above the minimum amount, the trial court may "consider any relevant factors, including, but not limited to,

the defendant's inability to pay, the seriousness and gravity of the offense and the circumstances of its commission, any economic gain derived by the defendant as a result of the crime, the extent to which any other person suffered losses as a result of the crime, and the number of victims involved in the crime. . . ." That section also specifies that "[c]onsideration of a defendant's inability to pay may include his or her future earning capacity" and that "[a] defendant shall bear the burden of demonstrating his or her inability to pay." (§ 1202.4, subd. (d).) The trial court need not make "[e]xpress findings . . . as to the factors bearing on the amount of the fine." (*Ibid.*)

Defendant contends that the trial court impliedly found he had no ability to pay when it agreed to suspend four of the other fees and fines. He argues that the trial court's comments indicate it based the $10,000 fine solely on the seriousness of the offenses, which "is inconsistent with the inability to pay finding the court had just made."

The sentencing record reflects that the trial court expressly considered defendant's ability to pay the restitution fine, as well as the seriousness of defendant's offenses, both of which were proper factors in determining the amount of the fine. (See § 1202.4, subd. (d).) Also, the trial court impliedly found that defendant could pay the restitution fine from his prison wages, and defendant does not argue that this finding is erroneous. (Cf. *People v. DeFrance* (2008) 167 Cal.App.4th 486, 504-505 [defendant failed to "show an absolute inability to ever pay the fine" where, "at current prison wages, the earliest he could pay the fine would be 27 years, while at the minimum rate it would take 126 years"].)

### J.     *Abstract of Judgment/AIDS Fee*

Defendant contends that the abstract of judgment incorrectly reflects the $70 AIDS education fine (§§ 288a, subd. (m), 1463.23), which the trial court had suspended. The Attorney General concedes that the abstract of judgment should be corrected to delete this fine.

## IV.     DISPOSITION

The judgment is affirmed.  The trial court is directed to prepare an amended abstract of judgment that deletes the $70 AIDS education fine, and to forward the amended abstract of judgment to the Department of Corrections and Rehabilitation.

_____
BAMATTRE-MANOUKIAN, ACTING P. J.

WE CONCUR:

_____
MIHARA, J.

_____
MÁRQUEZ, J.

*People v. Espinoza*
**H039787**